United States District Court
Southern District of Texas
**ENTERED**
September 15, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| James M.,[1] | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action H-25-3862 |
| | § | |
| Frank J. Bisignano,[2] | § | |
| Commissioner of the Social | § | |
| Security Administration, | § | |
| *Defendant*. | § | |

## MEMORANDUM AND ORDER

James M. appeals the Social Security Administration (SSA) Commissioner's final decision denying his application for Social Security benefits. ECF No. 1. Pending before the court are Plaintiff's Motion for Summary Judgment, ECF No. 12; and the Commissioner's Response and Cross Motion for Summary Judgment, ECF No. 18. The parties consented to the jurisdiction of the undersigned magistrate judge for all purposes, including entry of final judgment. ECF Nos. 3, 7. Plaintiff's Motion for Summary Judgment is **DENIED**. The Commissioner's Motion for Summary Judgment is **GRANTED**. The Commissioner's final decision is **AFFIRMED**.

---

[1] In light of guidance received from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which states that there are significant privacy concerns in social security cases, the court refers to the Plaintiff only by their first name or their first name and last initial.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Frank J. Bisignano is substituted as the defendant in this suit.

### *1. Procedural Posture*

On December 30, 2019, James filed an application for child's insurances benefits under Section 223(d) of the Social Security Act.[3] Tr. 49, 290–91. Additionally, on March 8, 2022, James filed application for disability insurance benefits, under Title II of the Social Security Act, and for supplemental social security income benefits, under Title XVI of the Social Security Act. Tr. 224–25. James alleged that his disability began at his birth, on November 22, 2001, due to autism spectrum disorder. Tr. 95, 224. James did not allege any physical impairments in his application for benefits.

The SSA denied James's application for disability benefits at the initial level on July 15, 2020, and upon reconsideration on October 6, 2020. Tr. 91–94, 96–98. Administrative Law Judge (ALJ) Solomon Boyle held an in-person hearing on April 17, 2024. Tr. 54–65. James's attorney was present at the hearing. Tr. 54, 56. She explained that James had autism, generalized anxiety disorder, and a recent diagnosis of bipolar disorder. Tr. 56. The attorney stated that James's mental impairments "greatly impact[ed]" his ability to stay focused and on task. *Id.*

After his attorney's statements, James testified about his education, home life, and medical conditions. Tr. 54–56. James stated that he graduated from high school. Tr. 57. He said that he had an assistant who helped him with some of his high school classes. Tr. 58.

James stated that he has never been employed. Tr. 57. However, he testified that he enjoyed doing volunteer work. Tr. 61. He stated that when he volunteered, he was able to ask what he needed to do and whether it was okay to do certain things. *Id.* James testified that his mom would assign him chores at home,

---

[3] To be entitled to child's insurance benefits, a claimant must have a disability that began before attainment of age 22. 42 U.S.C. § 402(d).

but he needed reminders and motivation to complete those chores. Tr. 60. James stated that he was able to wash his clothes, brush his teeth, "do the dishes in the dishwasher," and use the stove to prepare food, including fried eggs, chicken and spinach pasta, and toast. Tr. 60–61. He stated that he cannot drive a car. Tr. 58.

As to his social life and hobbies, James testified that he liked to be around other people. Tr. 59. He stated that he socialized with his friends only through social media because he did not want to bother them while they were at work. Tr. 59–60. James testified that he listened to music to stay focused. Tr. 60. He stated that he did not watch television, but he watched videos on YouTube. Tr. 61.

James's testimony about his mental impairments focused primarily on his anxiety. Tr. 58. He stated that, on a daily basis, he heard voices that were both threatening and comforting. Tr. 59. He stated that throughout the day, he exhibited repetitive behaviors in the form of rubbing his hands together and rocking. Tr. 62. James testified that he had recently started some new medications that made him feel drowsy. *Id.* He testified that he liked to be on a routine, and he stated that it is "a little bit" difficult for him if someone changes that routine. Tr. 61–62.

The Vocational Expert (VE) testified after James. The ALJ asked the VE a series of hypothetical questions, in which the VE was to consider a hypothetical claimant, described as a person of James's same age and education level. Tr. 63. The ALJ instructed that the hypothetical claimant would have no exertional limitations, but he would be limited by understanding, remembering, and carrying out only simple and routine tasks involving simple work-related instructions; interacting only occasionally with coworkers and supervisors, and never with the general public; and having only occasional workplace changes. *Id.* The VE testified that a hypothetical claimant with those

limitations would be capable of performing certain unskilled (SVP-2), medium-exertion jobs, as defined by the Dictionary of Occupational Titles (DOT), that are available in the national economy. *Id.* The VE explained that those unskilled jobs included laundry worker, hand packager, and industrial cleaner. Tr. 63–64. The ALJ then asked whether the same hypothetical claimant would be able to perform any work in the national economy if they were also off task for 20% or more of the workday. Tr. 64. The VE testified that such an individual would not be able to work on a full-time basis, as the customary standard is to remain on task approximately 90% of the workday. *Id.* James's attorney declined cross-examination of the VE, and the ALJ closed the hearing. *Id.*

The ALJ issued his decision on June 20, 2024, finding that James was not disabled from November 22, 2001, through the date of the decision. Tr. 34, 37–49. James requested review of the ALJ's decision, which the Appeals Council denied on October 22, 2024. Tr. 17. After the SSA granted James's requests for extensions of time to file a civil action, James timely filed his complaint and an application to proceed in forma pauperis in federal court on February 14, 2025. Tr. 1–2; *James M. v. Comm'r of Soc. Sec.*, No. 4:25-mc-00274, ECF No. 1 (S.D. Tex. Feb. 14, 2025).

***2. Legal Standards***

The Social Security Act provides disability insurance benefits to individuals with physical and mental disabilities who have contributed to the program and provides supplemental income to individuals with physical and mental disabilities who have limited income and resources. *See* 42 U.S.C. §§ 423, 1382. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner uses a sequential, five-step approach to determine whether the claimant is disabled. *Schofield v. Saul*, 950 F.3d 315, 317 (5th Cir. 2020); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof on the first four steps, and the Commissioner bears the burden on the fifth step. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021). A finding that the claimant is disabled or not disabled at any point in the five-step review terminates the analysis. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

This court's review of the ALJ's disability determination is "highly deferential." *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018) (citations omitted). The court "ask[s] only whether substantial evidence supports the decision and whether the correct legal standards were employed." *Id.* "A decision is supported by substantial evidence if 'credible evidentiary choices or medical findings support the decision.'" *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (quoting *Whitehead v. Colvin*, 820 F.3d 776, 779 (5th Cir. 2016)). "Substantial evidence is 'more than a mere scintilla but less than a preponderance.'" *Id.* (quoting *Williams v. Admin. Rev. Bd.*, 376 F.3d 471, 476 (5th Cir. 2004)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The reviewing court must scrutinize the record to determine whether substantial evidence supports the ALJ's decision, but it may not reweigh the evidence or substitute its judgment. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

### *3. Analysis*

#### *A. Step One*

At step one, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). A person engaged in substantial gainful activity is not disabled, regardless of her medical condition, age, education, or work experience. *Id.*

The ALJ found that James has not engaged in substantial gainful activity since attaining the age of eighteen. Tr. 36. James testified that he had never engaged in substantial gainful activity, and the record showed that he did not have any reported income since he turned eighteen. *Id.*; Tr. 57. James does not dispute the ALJ's step-one finding.

#### *B. Step Two*

At step two, the ALJ determines whether any of the claimant's impairments, or any combination thereof, is severe and has lasted or is expected to last a continuous period of at least twelve months. 20 C.F.R. §§ 404.1520(a)(4)(ii) (citing 20 C.F.R. § 404.1509), 416.920(a)(4)(ii) (citing 20 C.F.R. § 416.909). An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment is "not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience." *Keel*, 986 F.3d at 555 (quoting *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985)). "A person who does not have a 'severe impairment' is not disabled." *Schofield*, 950 F.3d at 318 (citing 20 C.F.R. § 404.1520(c)).

The ALJ found that James has medically determinable severe impairments of "Autism; depressive disorder; bipolar disorder; generalized anxiety disorder; and post-traumatic stress disorder (PTSD)." Tr. 36. The ALJ also found that James has non-severe impairments of low body-mass index (BMI) and slightly elevated blood pressure. *Id.* The ALJ noted that the non-severe impairments would not be expected to interfere with James's ability to work. *Id.* James does not dispute the ALJ's step-two findings.

### *C. Step Three*

At step three, the ALJ determines if any severe impairment meets or equals a listed impairment (Listing) in Appendix 1. 20 C.F.R. § 416.920(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Listing sections describe impairments that the SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of . . . age, education, or work experience." 20 C.F.R. § 416.925(a). The claimant will be found disabled if the claimant's impairments meet or equal all of the specified criteria of a Listing. 20 C.F.R. § 416.920(d); *Whitehead*, 820 F.3d at 781. The claimant has the burden of establishing that their impairments match the Listing. *Whitehead*, 820 F.3d at 781.

The ALJ determined that James's mental impairments, considered singly and in combination, did not meet or equal the severity of impairments in Listing Sections 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.10 (autism spectrum disorder), or 12.15 (trauma- and stressor-related disorders) because James did not satisfy the "paragraph B" criteria. Tr. 36.

To be found disabled at step three, the claimant's mental disorder must satisfy the "paragraph B" criteria. Listing § 12.00(A)(2). A claimant who does not satisfy paragraph B cannot meet or equal the severity of impairments in the Listings in Section 12. The paragraph B criteria "represent the areas of mental functioning a person uses in a work setting." Listing § 12.00(A)(2)(b). Those areas are the claimant's ability to (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* The ALJ must evaluate the claimant's ability to function in each of the four areas using this five-point rating scale:

> a. No limitation (or none). [Claimant is] able to function in this area independently, appropriately, effectively, and on a sustained basis.
>
> b. Mild limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.
>
> c. Moderate limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.
>
> d. Marked limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.
>
> e. Extreme limitation. [Claimant is] not able to function in this area independently, appropriately, effectively, and on a sustained basis.

Listing § 12.00(F)(2). To meet the paragraph B criteria, a claimant's disorder must result in an "extreme" limitation in one or a "marked" limitation in two of the four areas of mental functioning. *Id.* As the court describes below, the ALJ found that James had moderate limitations in each of the four areas. Tr. 37–43.

### *i. James's Ability to Understand, Remember, or Apply Information*

The ALJ noted that James had stated in a function report submitted to the SSA that it was "hard for him to follow written instructions," but that he was able to follow "spoken instructions good if he follows one instruction at a time." Tr. 37 (citing Tr. 321). The ALJ discussed the disability accommodations that James received during high school. *Id.* (citing Tr. 371–72, 375–76, 383, 385). The ALJ concluded that those accommodations appeared to have been successful, as James graduated from high school with a passing GPA. *Id.* (citing Tr. 305). The ALJ stated that during both of James's consultative clinical interviews and mental status exams, James was noted to be alert, oriented, and responsive. *Id.* (citing Tr. 412, 416). The ALJ noted that one of the consultative clinical interviewers stated that James's thought processes "appeared clear and coherent, but concrete," while the other concluded that James's "thought processes were normal." Tr. 37–38 (citing Tr. 412, 416). The ALJ also considered treatment notes from James's mental health provider, who noted that James's "estimated intellectual functioning is in the average range, with no memory impairment, and age-appropriate fund of knowledge, although his intellectual functioning is noted to be limited." Tr. 38 (citing Tr. 435–36).

Based on his review of the record, the ALJ concluded that James was moderately limited in his ability to understand, remember, or apply information. Tr. 37.

### *ii. James's Ability to Interact with Others*

The ALJ discussed James's hearing testimony, in which James stated that he liked to be around people, talked to others on social media, and enjoyed performing volunteer work. Tr. 38. The ALJ noted that James also testified that when he performed volunteer work, he was told what to do. *Id.* The ALJ also reviewed

a function report in which James reported that he left the house, sometimes alone, at least once per day, and that he did not drive because he did not want to. *Id.* (citing Tr. 310). The ALJ noted that in the same report, James stated that he was capable of shopping for food and clothes, and that he did so regularly. *Id.* (citing Tr. 310). Moreover, James reported that he had no trouble getting along with family, friends, neighbors, and authority figures. *Id.* (citing Tr. 321–22).

The ALJ reviewed James's school records, which reflected that James had difficulty initiating conversations and maintaining topics, which "was noted to affect his participation and functioning across settings." Tr. 38 (citing Tr. 405). However, the ALJ noted that the school records showed that James's ability to maintain a topic in conversation had improved over time. The ALJ pointed out that James had no history of behavioral concerns at school, and that a teacher reported in 2019 that one of James's ten documented strengths was "listening [to] and following classroom/work rules and procedures," but one of James's two documented weaknesses was "independently working through the problem-solving process." Tr. 39 (citing Tr. 373, 378, 392, 405).

The ALJ noted that in both of James's consultative exams, James reported that he had good relationships with his family members. *Id.* (citing Tr. 413, 416). The ALJ stated that both exams reflected that James had some level of difficulty maintaining eye contact. *Id.* (citing Tr. 413, 416). The ALJ also noted that James reported in one of his consultative exams that he had friends who he communicated with up to every other day, but that he experienced episodes of anxiety, lasting up to a few minutes, when he attended a church group or hung out with friends. *Id.* (citing Tr. 412–13).

The ALJ reviewed treatment notes from two of James's mental health providers. Tr. 39–40 (citing Tr. 435–36, 422, 424). One provider noted that during treatment, James's social judgment was only mildly impaired, but that he had difficulty with interpersonal relationships. Tr. 39 (citing Tr. 435–36). In an earlier treatment note, another one of James's mental health providers noted that James had no problems with behavior, and that he went on mission trips. Tr. 40 (citing Tr. 422, 424). The ALJ explained that those "mission trips would reasonably require [James] to interact with others on a regular basis." *Id.*

Based on his review of the record, the ALJ concluded that James was moderately limited in his ability to interact with others. Tr. 38.

#### *iii. James's Ability to Concentrate, Persist, or Maintain Pace*

As for concentrating, persisting, or maintaining pace, the ALJ reviewed James's hearing testimony and function report, school records and reports, consultative interviews, and mental health treatment records. Tr. 40–41. The ALJ's summary of James's hearing testimony includes details about the voices that James purportedly heard on a daily basis, and James's use of music to help him stay focused. Tr. 40. As to James's function report, the ALJ stated that James reported that he was able to play games on his Xbox daily. Tr. 41 (citing Tr. 320). The ALJ noted that James also reported that he was able to pay attention for just five minutes, but that he stated that he was able to "finish what he start[ed]." *Id.* (citing Tr. 321).

The ALJ noted that a 2019 school report reflected that James completed his school work in a timely manner without extensions of time, that he was prepared and generally "good about being on task," and that he was "flexible with the changes in routine and cooperate[d] well." Tr. 40 (citing Tr. 372–73, 375). The

report also reflected that James did not have behavioral problems at school. *Id.*

The ALJ described James's two 2020 consultative clinical interviews and mental status exams. Tr. 41 (citing Tr. 412–13, 416). The ALJ explained that in the July 2020 interview and exam, James's mother stated that James "exhibit[ed] poor attention span," but that James's thought processes during the interview appeared "clear and coherent." *Id.* (citing Tr. 412). The ALJ noted that the following month, James was "observed to be alert and responsive throughout his examination" and had "normal" thought processes, although he "was paranoid, and grandiose, with regards to delusions." *Id.* (citing Tr. 416).

Based on his review of the record, the ALJ concluded that James was moderately limited in his ability to concentrate, persist, or maintain pace. Tr. 40.

#### *iv. James's Ability to Adapt and Manage*

As for adapting or managing oneself, the ALJ reviewed James's own statements about his abilities and limitations. Tr. 41. Consistent with the court's earlier description of James's testimony, the ALJ summarized James's testimony about his living arrangement, his ability to perform chores and cook food, his expressed enjoyment of volunteer work, and his statement that he likes to be in a routine "a little bit." *Id.* The ALJ described James's function report, in which James reported that he did not need reminders to perform his personal needs and grooming, and that he had no problem with personal care. *Id.* (citing Tr. 317–18). In the function report, James also reported that he was able to leave the house by himself, including for the purpose of shopping in stores and visiting the church or the YMCA, but that he did not have a desire to drive, and that his mother handled his money. *Id.* (citing Tr. 319). Additionally, the ALJ noted that James "reported

that he handles changes in routine okay if his mother helps him." Tr. 42 (citing Tr. 322).

The ALJ noted that in James's first consultative interview in July 2020, James "was casually dressed and neatly groomed" and he reported that he was able to independently complete chores and care for himself. Tr. 42 (citing Tr. 412–13). By contrast, the ALJ stated that in the later consultative interview, James was noted to "appear disheveled and neglectful of his activities of daily living." *Id.* (citing Tr. 416).

The ALJ also reviewed James's school record and mental health treatment records. Tr. 42. The ALJ stated that James's school records showed that James attended a day program to learn job skills for eventual employment. *Id.* (citing Tr. 374). School records also noted that James was "independent in his living skills," and that James did not need any additional work-related behaviors "for the development of employment and other post-school adult living." *Id.* (citing Tr. 374–75, 377).

The ALJ stated that James's mental health treatment records from September 2023 to March 2024 noted that James did well when he had a routine, that he performed some tasks around the home, and that he went on mission trips. Tr. 42 (Tr. 422–24). James's April 2024 treatment records, however, noted that he required the assistance of others to perform certain activities of daily living, including searching for jobs. *Id.* (citing Tr. 433, 436).

Based on his review of the record, the ALJ concluded that James was moderately limited in his ability to adapt or manage himself.

### *v. The ALJ's Paragraph B Findings and Overall Step Three Determination*

Because James did not have at least two "marked" limitations or one "extreme" limitation in the four areas of mental functioning, the ALJ determined that he did not satisfy the paragraph B criteria. Tr. 43.

The ALJ's step-three determination is supported by substantial evidence and comports with the law. The step three findings are not directly in dispute, although James maintains that the ALJ did not "adequately account for [his] mental limitations" in formulating the RFC, which is discussed below. ECF No. 12 at 14. James does not point out any evidentiary or legal error in the ALJ's step three findings. The ALJ specifically cites portions of the record in making his step three findings. Having reviewed the record and the briefing, the court detects no error—legal or factual.

### *D. Residual Functional Capacity*

Before reaching the final two steps, the ALJ must assess the claimant's residual functional capacity (RFC). 20 C.F.R. § 404.1520(e) (citing 20 C.F.R. § 404.1545); 20 C.F.R. § 416.920(e) (citing 20 C.F.R. § 416.945). The RFC is a determination of the most a claimant can do despite all physical and mental limitations. *Perez*, 415 F.3d at 461–62 (citing 20 C.F.R. § 404.1545(a)(1)). The RFC determination is based on "the medical evidence in the record, including the testimony of physicians and the claimant's medical records." *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021). "An 'ALJ is responsible for determining an applicant's residual functional capacity.'" *Id.* (quoting *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)); *see also* 20 C.F.R. §§ 404.1546(c), 416.946(c).

The ALJ determined that James had the RFC

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is limited to understanding, remembering, and carrying out simple and routine tasks involving simple work-related instructions. The claimant can have no interaction with the general public, and only occasional interaction with coworkers and supervisors. The claimant is limited to only occasional workplace changes.

Tr. 43. In making his RFC determination, the ALJ considered the entire record, including James's hearing testimony and statements he made to medical providers, the medical records, and the various statements and opinions of James's medical providers. Tr. 43–47. The ALJ explained that, although James's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, his statements about the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the evidence in the record. Tr. 46–47.

The ALJ's summary of James's statements is consistent with James's hearing testimony, which the court summarized above in Part 1 of this Memorandum and Order. Essentially, during the hearing, James explained that he had anxiety, for which he was medicated, and that he heard voices, which sometimes comforted him and sometimes criticized him. Tr. 43. James stated that he periodically exhibited repetitive behaviors—rubbing his hands together and rocking. *Id.* James also testified that his anxiety medications made him very sleepy. *Id.*

The ALJ reviewed the opinions of two different consultative examiners who interviewed James and performed a mental status exam. Tr. 44. In July 2020, James was diagnosed by the first consultative examiner, Dr. Lindsay Rosin, as having autism spectrum disorder with accompanying language impairment. *Id.*

(citing Tr. 413). Dr. Rosin noted that James's mother stated that James was first diagnosed with autism at age two, but that he had never received treatment for autism nor taken prescription medications. *Id.* (citing Tr. 411). The ALJ described Dr. Rosin's review of James's school records, which was consistent with the ALJ's review of the school records that the court described throughout Part 3 above. *Id.* (citing Tr. 411). The ALJ stated that Dr. Rosin's mental status exam revealed that James had "no more than moderate limitations under the 'paragraph B' criteria . . . ." *Id.* (citing Tr. 412–13). The ALJ also noted that Dr. Rosin's report stated that James "was negative for hallucinations during his exam." *Id.* (citing Tr. 412). The ALJ stated that Dr. Rosin did not render an opinion regarding James's functional limitations. *Id.*

Dr. Ashok Jain conducted a clinical interview and mental status exam of James in August 2020. Tr. 44 (citing Tr. 417). Dr. Jain diagnosed James with PTSD, panic disorder, bipolar disorder, and autistic disorder. *Id.* (citing Tr. 417). Dr. Jain reported that James exhibited an extensive list of symptoms associated with those conditions and other mental health problems, but James was again negative for hallucinations during the exam. *Id.* (citing Tr. 416–17). The ALJ noted that James "had never seen a psychiatrist or therapist as of the date of his exam [with Dr. Jain], and he had never taken any psychiatric medications in the past or been hospitalized for psychiatric reasons." *Id.* (citing Tr. 416). The ALJ explained that Dr. Jain opined that James was not likely to become gainfully employed for at least the next two years because of his "severe" symptoms. *Id.* (citing Tr. 416–18). Dr. Jain also opined that James "had overwhelmingly marked to extreme limitations" in at least two of the paragraph B functional areas. Tr. 45 (citing Tr. 416–18).

The ALJ did not find Dr. Jain's opinion persuasive. Tr. 45. He explained that the opinion was neither supported by nor consistent with the record as a whole. *Id.* Moreover, the ALJ explained that Dr. Jain's opinion was not supported by the doctor's own examination and evaluation of James, "which demonstrated no more than moderate limitations under the 'paragraph B' criteria." *Id.* In support of his credibility determination, the ALJ noted that Dr. Rosin's earlier exam also demonstrated that James had no more than moderate paragraph B limitations. *Id.* The ALJ pointed out that James had not received any mental health treatment or medication at the time of Dr. Jain's exam. *Id.* He noted that treatment records, which post-dated Dr. Jain's exam, showed that James's mental health symptoms were stable and controlled with appropriate treatment. *Id.* The ALJ then discussed those treatment records and James's subsequent "normal to grossly normal mental status exams." *Id.*

The ALJ reviewed and summarized the 2023 and 2024 treatment records from two of James's mental health providers. The ALJ noted that a September 2023 treatment note indicated that James had no symptoms on the PHQ-2 (a depression screening). Tr. 45 (citing Tr. 422). James's mother reported that James was doing well on his prescription medication, Zoloft, particularly when he had a routine. *Id.* (citing Tr. 422). The treating physician reported that he had no behavior problems, and that he was able to work around the house. *Id.* (citing Tr. 422). In March 2024, James sought to establish mental health treatment and medication management at a different clinic. *Id.* (citing Tr. 432, 475). That clinic's records reflected that James reported a history of anxiety, depression, and autism, along with variety of current and ongoing mental health symptoms, including delusions, auditory hallucinations, and "depression symptoms in the form of not wanting to be around people, guilt, poor concentration, fatigue,

and distractibility." Tr. 45–46 (citing Tr. 433). James reported that he had no history of hospitalization for psychiatric treatment and had never attempted suicide. Tr. 45 (citing Tr. 434). The clinic diagnosed James with bipolar disorder, moderate depression, and generalized anxiety disorder, and prescribed two new medications for him to take along with his Zoloft. *Id.* (citing Tr. 428–429, 432, 436).

The ALJ also discussed the results of James's mental status exams in March and April of 2024. Tr. 45–46. The ALJ noted that in March 2024, James's mental status exam showed that he was "normal in all areas." *Id.* (citing Tr. 443–44, 459). In April 2024, James was found to be normal overall, except that he exhibited "a sad affect, a delayed reaction in speech, and an anxious and depressed mood, with only mildly impaired concentration and social judgment." *Id.* (citing Tr. 435, 454). In both exams, James was negative for hallucinations. *Id.* The ALJ concluded that "with appropriate treatment, [James's] mental status exams [were] mostly normal to normal," which "demonstrate[ed] that his mental health symptoms [were] overall well controlled and stable with medication management." *Id.* In contrast, the ALJ noted that during the two-year period in which James did not take medications, he reported having "a lot of symptoms," including "delusions and auditory hallucinations." *Id.* (citing Tr. 428–45). The ALJ stated that such symptoms had been denied in all of James's prior treatment visits. *Id.* (citing Tr. 428–45).

The ALJ stated that he reviewed and considered the function report and James's daily activities, as well as the third-party function report and correspondence, which were both from James's mother. Tr. 46 (citing Tr. 306–13, 316–23, 332–39, 365). He explained that the statements in those reports and James's hearing testimony "help[ed] with the understanding of [James's] medical issues[.]" *Id.* The ALJ also explained that "their

persuasiveness [was] proportionate to their overall supportability by, and consistency with, the objective medical record." *Id.* The ALJ concluded that the objective medical evidence demonstrated that James was less impaired than was suggested. *Id.*

The ALJ also reviewed the opinions of the state agency psychological consultants (SAPCs), Dr. Matthew Turner and Dr. Joel Forgus, at the initial and reconsideration level, respectively. Tr. 47. The ALJ noted that both SAPCs opined that James had "moderate limitations under all of the 'paragraph B' criteria, with commensurate mental functional limitations, and all of [James's] functional limitations would be non-exertional." *Id.* (citing Tr. 67–77, 79–90). The ALJ found those opinions persuasive, as they were supported by and consistent with the record. *Id.* However, the ALJ noted that his own findings were "not entirely consistent" with those of the SAPCs. *Id.*

The ALJ concluded that his RFC was reasonable because, with appropriate treatment, James was able to "engage in a range of work at all exertional levels taking into consideration his moderate limitations under the 'paragraph B' criteria with commensurate mental functional limitations." Tr. 47. Summarizing his rationale, the ALJ stated that the record did not show that James had "ongoing mental health symptoms, treatment, or objective deficits for more than 4 years after attaining age 18." *Id.* The ALJ explained that the record showed that James did not receive ongoing mental health treatment until March 2024. *Id.* He noted that James's symptoms appeared to be controlled with medication. *Id.* Additionally, the ALJ stated that the observations of James's teachers—documented shortly before James turned eighteen—demonstrated that he "worked well in school and he successfully completed his assignments with his accommodations, and he was able to work with others and by

himself, again with his accommodations, with no behavior concerns." *Id.* (citing Tr. 372–73).

The RFC was determined according to the appropriate legal framework and is supported by substantial evidence. Each of the mental limitations is supported by the record. The ALJ considered all of the evidence in the record and weighed its credibility. The ALJ properly considered the consistency and supportability of the medical opinions in the record and explained his evaluation of their persuasiveness, as required by 20 C.F.R. Sections 404.1520c and 416.920c. The ALJ also properly considered all of the objective medical evidence in the record, including James's normal or near-normal mental status exams. The ALJ then concluded that while the evidence showed that James had mental limitations, those limitations were not as severe as James asserted. Those facts fully support the RFC.

James argues that the ALJ erred because he did not adequately account for James's mental limitations within the RFC. ECF No. 12 at 14. He asserts that the ALJ should have specifically limited him to making only "simple decisions." *Id.* Moreover, James argues that the ALJ failed to create an "accurate and logical bridge" because he did not explain how he found both of the SAPCs' opinions persuasive, while not including in his RFC all of the specific mental limitations that the SAPCs recommended. *Id.* at 15 (citing *Price v. Asture*, 401 F. App'x 985, 987 (5th Cir. 2010)). In their Mental Residual Functional Capacity (MRFC) assessments, both SAPCs explained that James could "understand, remember, and carry out only simple instructions, make simple decisions." Tr. 76, 89. The ALJ's RFC determination does not limit James to "simple decisions." Accordingly, James asserts that without an explanation by the ALJ of why he omitted the "simple decisions" limitation from his RFC, the court is left to create an impermissible "post-hoc rationalization." ECF No. 12 at 13, 17 (citing *Schwartz v.*

*Kijakazi*, No. 20-0739, 2021 WL 3620071, at *1 (S.D. Tex. Aug. 16, 2021) ("*[P]ost hoc* rationalizations are not to be considered.")). The Commissioner, on the other hand, argues that the RFC sufficiently accounts for the "simple decisions" limitation, as "[m]aking decisions at work is a task, and the ALJ's RFC finding restricted [James] to simple and routine tasks." ECF No. 18 at 6.

Each of the paragraph B criteria have many underlying aspects. *See* Listing § 12.00E (describing the criteria and which abilities each area of mental function refers to). Many cases stand for the proposition that the ALJ does not have to find a work-related functional limitation in the RFC simply because he finds a "moderate" limitation in the paragraph B criteria. *See, e.g.*, *Beasley v. Colvin*, 520 F. App'x 748, 754 (10th Cir. 2013) ("The ALJ was under no obligation to include limitations in social functioning in [the claimant's] RFC based solely on his finding that she had 'moderate difficulties' in social functioning as part of the distinct step-three analysis."); *Gunderson v. Astrue*, 371 F. App'x 807, 809 (9th Cir. 2010) ("[T]he ALJ is not required, as a matter of law, to include all the limitations from the impairments the ALJ deems to be severe at step two in the ALJ's final RFC analysis."); *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1228–29 (9th Cir. 2009) ("[The claimant] offers no authority to support the proposition that a severe mental impairment must correspond to limitations on a claimant's ability to perform basic work activities.").

Moreover, "[t]he limitations on which the RFC is based are not required to be included verbatim in the RFC . . . so long as the decision shows that the ALJ considered those limitations in reaching the RFC determination." *Hall v. Berryhill*, No. 17-2029, 2018 WL 4103229, at *7 (S.D. Tex. Aug. 7, 2018); *see also Miller v. Kijakazi*, No. 22-60541, 2023 WL 234773, at *4 (5th Cir. Jan. 18, 2023) ("Although [the claimant] is correct that the ALJ did not adopt a specific physician's assessment, there is no requirement

that an ALJ do so.”). The Fifth Circuit has affirmed RFCs that “neither ‘adopted the state agency report verbatim nor accepted the testimony of a treating physician,’ but [were] nevertheless ‘based on substantial evidence.’” *Miller*, 2023 WL 234773, at *4 (citing *Webster v. Kijakazi*, 19 F.4th 715, 719 (5th Cir. 2021)).

Again, both SAPCs determined that James had a moderate limitation in each of the paragraph B functional areas. Tr. 76, 89. In the narrative explanation of their MRFC findings, both SAPCs wrote that James could “understand, remember, and carry out only simple instructions, make simple decisions.” *Id.* Elsewhere in their opinions, however, both SAPCs separately opined that James was “[n]ot significantly limited” in his “ability to make simple work-related decisions.” Tr. 75, 88.

The ALJ specifically noted that while he found the SAPC’s opinions persuasive, his RFC findings were not exactly on all fours with theirs. Tr. 47. It is clear that he found the opinions persuasive to the extent that they found that James’s RFC should reflect his “moderate limitations under all of the ‘paragraph B’ criteria, with commensurate mental functional limitations, and all of [James’s] functional limitations would be non-exertional.” Tr. 47 (citing Tr. 67–77, 79–90). The ALJ included in the RFC the mental limitations of “understanding, remembering, and carrying out simple and routine tasks involving simple work-related instructions.” Tr. 43. As James’s Motion points out, contrary to the SAPCs’ opinions, the ALJ did not explicitly limit James to making only “simple decisions.” That does not constitute legal error.

Despite omitting the “simple decisions” limitation from the RFC, the ALJ’s decision demonstrates that he considered James’s ability to make decisions. For example, the ALJ reviewed James’s “normal to grossly normal” mental status exams in 2023 and 2024, as well as James’s 2020 exams, which noted his “normal” and “clear and coherent” thought processes. Tr. 45–46 (citing Tr. 435,

443–44, 454, 459); Tr. 37–38, 41 (citing Tr. 412, 416). The ALJ also noted that the record showed that James had independent living skills, and that he was noted not to need additional work-related behaviors "for the development of employment and other post-school adult living." Tr. 42 (citing Hearing Testimony; Tr. 374–75, 377, 412–13); *see also* Tr. 41 (citing Tr. 317–18) (self-reporting that James did not need reminders to perform personal care).

The ALJ's decision indicates that he properly considered, referenced, and balanced all the evidence in the record. The ALJ included in the RFC many limitations to account for James's mental limitations, such as limiting him to "simple and routine tasks," "simple work related instructions," and occasional changes in the workplace. Tr. 43. Additionally, the ALJ posed the exact RFC to the VE, and James's counsel declined to cross-examine the VE. Tr. 63–64. The RFC is not in error, and it is based on substantial evidence. The court finds no error—legal or factual—in the ALJ's RFC assessment.

### *E. Step Four*

At step four, the ALJ determines whether the claimant can perform jobs they previously worked by comparing the RFC determination with the demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f); *see also Perez*, 415 F.3d at 462. If the claimant can perform their past work, they are not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant cannot perform their past work, the ALJ proceeds to step five. *See* 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

James does not have past relevant work. Tr. 47. Accordingly, the ALJ proceeded to step five.

### *F. Step Five*

At step five, the ALJ determines whether the claimant can perform any other work by considering the claimant's RFC and other factors, including age, education, and past work experience. *Schofield*, 950 F.3d at 318 (quoting 20 C.F.R. § 404.1520(a)(4)(v)). If the claimant can perform other work available in significant numbers in the national economy, the claimant is not disabled. *Id.* (citing 20 C.F.R. § 404.1520(g)).

The ALJ posed a hypothetical to the VE during the hearing that contained all of the limitations in the RFC that the ALJ ultimately found. Tr. 63. The VE testified that a person of the same age, education, past work history, and limitations as the claimant could perform jobs that exist in significant numbers in the national economy. *Id.* The ALJ relied on the VE's testimony that an individual of James's age, education, work experience, and RFC would be able to work as a laundry worker, hand packager, or industrial cleaner. Tr. 48. As such the ALJ concluded that James was not disabled prior to November 21, 2023—the date on which James attained age 22. Tr. 49. Additionally, the ALJ concluded that James had not been under a disability through the date of the decision. *Id.*

Because the VE's testimony was based on the ALJ's hypothetical question that incorporated all the limitations reasonably recognized by the ALJ, and because James's attorney had the opportunity to cross-examine the VE, the VE's testimony is substantial evidence supporting the ALJ's step-five determination.

Accordingly, the ALJ's findings at step five are supported by substantial evidence and are not the product of legal error.

#### *4. Conclusion*

The ALJ's decision denying social security benefits is consistent with the law and supported by substantial evidence. There is no genuine issue of material fact, and summary judgment is appropriate. Fed. R. Civ. P. 56(a), (c).

Accordingly, Plaintiff's Motion for Summary Judgment, ECF No. 12, is **DENIED**. Commissioner's Cross Motion for Summary Judgment, ECF No. 18, is **GRANTED**, and the Commissioner's final decision is **AFFIRMED**.

A separate final judgment will be entered.

Signed at Houston, Texas, on September 15, 2026.

Peter Bray
United States Magistrate Judge